Refugio LUGO et al., Plaintiffs-Appellants Cross-Appellees,

v.

G. William MILLER et al., Defendants-Appellees Cross-Appellants.

Nos. 78-3478, 78-3479.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 19, 1980.
Decided Jan. 28, 1981.

John P. Worcester, R. Michael Frank, Advocates for Basic Legal Equality, Toledo, Ohio, Marilyn Rose, Center for Law and Social Policy, Washington, D. C., for plaintiffs-appellants cross-appellees.

James R. Williams, U. S. Atty., Toledo, Ohio, John M. Cunningham, M. Carr Ferguson, Gilbert Andrews, Leonard Henzke, U. S. Dept. of Justice, Tax Division, Appellate Section, Washington, D. C., for defendants-appellees cross-appellants.

Before BOYCE F. MARTIN, Jr., Circuit Judge, CELEBREZZE, Senior Circuit Judge and JOINER, District Judge.*

CELEBREZZE, Senior Circuit Judge.

Plaintiffs-appellants (hereinafter plaintiffs), a group of low income individuals, brought this class action in 1974 on behalf of all persons unable to afford hospital services, against the Secretary of the Treasury, the Commissioner of Internal Revenue, and seven Ohio hospitals.[1] Plaintiffs asserted that Revenue Ruling 69–545, which announced an Internal Revenue Service policy of extending favorable tax treatment under the Internal Revenue Code of 1954 (Code) to hospitals that did not serve low income persons to the extent of the hospitals' financial ability, encouraged hospitals to deny services to indigents, and was invalid because it was an erroneous interpretation of the Code and because it had been issued in violation of the Administrative Procedure Act. They sought to enjoin the Treasury officials from granting tax exempt status under Sec. 501(c)(3) of the Code to non-profit hospitals as "charitable" organizations without requiring such hospitals to provide free emergency and non-emergency services to low income persons to the extent of the hospitals' financial ability. The district court overruled the jurisdictional objections raised by the Treasury officials, but dismissed the plaintiffs' action for failure to state a claim upon which relief could be granted. The plaintiffs have appealed that

---

* Honorable Charles W. Joiner, U. S. District Court for the Eastern District of Michigan, sitting by designation.

1. The action also named the U. S. Secretary of Health, Education, and Welfare, Officials of the Ohio Department of Health, and Hospitals which received federal construction monies for violations of their duties under Title VI and XVI of the Public Health Service Act which authorities provided the monies (42 U.S.C. Secs. 291c, 291e and 300o –1(6). Those allegations and the district court's rulings are not the subject of this appeal.

part of the final judgment dismissing their case and the government has appealed the district court's failure to dismiss the case for lack of jurisdiction. We now reverse the decision of the district court on the latter issue because of our conclusion that the plaintiffs lack standing to maintain this lawsuit.

## BACKGROUND

The facts of this case are uncontested. The genesis of the dispute is the Internal Revenue Code. Section 501 of the Code exempts from federal income taxes a number of organizations, including organizations operated exclusively for charitable purposes. Contributors to organizations defined in Sec. 501(c)(3) are generally allowed a charitable contribution deduction under Sec. 170 of the Code, thus allowing the amount of the contribution to be deducted from their gross income for purposes of determining the amount of income subject to the federal income tax. Such contributions are also deductible for purposes of calculating estate and gift taxes. *See* I.R.C. Secs. 2055(a)(2), 2106(a)(2) and 2522. Pursuant to authority granted to the Treasury Department and Internal Revenue Service under Section 7805, the IRS issued a revenue ruling in 1956 (Rev.Rul. 56–185, 1956–1 Cum.Bull. 202) setting forth the requirements which a non-profit hospital must satisfy to qualify for tax exempt status as a "charitable" organization under Sec. 501(c)(3). The ruling grounded tax exempt status on non-profit hospitals providing medical care to those unable to pay to the extent of the hospitals' financial ability.[2]

In 1969 the Internal Revenue Service issued Revenue Ruling 69–545 (1969–2 Cum. Bull. 117), modifying the requirements which a hospital had to meet to qualify under Sec. 501(c)(3). This new ruling concluded that a non-profit hospital could qualify as a charitable organization if it provided free emergency care to indigent persons and accepted all patients able to pay solely the actual costs of their treatment. Thus, hospitals were no longer compelled to provide free non-emergency care to the extent of their financial ability in order to qualify as charitable organizations.[3]

The 14 plaintiffs in the present case filed their complaint in 1974, asserting that they

---

**2.** The 1956 Ruling provided: In order for a hospital to establish that it is exempt as a public charitable organization within the contemplation of Sec. 501(c)(3), it must, among other things, show that it meets the following general requirements: it must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay. It is normal for hospitals to charge those able to pay for services rendered in order to meet the operating expenses of the institution, without denying medical care or treatment to others unable to pay. The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability. It may furnish services at reduced rates which are below cost, and thereby render charity in that manner. It may also set aside earnings which it uses for improvements and additions to hospital facilities. It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services. Furthermore, if it operates with the expectation of full payment from all those to whom it renders services, it does not dispense charity merely because some of its patients fail to pay for the services rendered.

**3.** The 1969 Ruling provided in part: By operating an emergency room open to all persons and by providing hospital care for all persons in the community able to pay the cost thereof either directly or through third party reimbursement, hospital A is promoting the health of a class of persons that is broad enough to benefit the community.

The fact that hospital A operates at an annual surplus of receipts over disbursements does not preclude its exemption. By using its surplus funds to improve the quality of patient care, expand its facilities, and advance its medical training, education, and research programs, the hospital is operating in furtherance of its exempt purposes.

Furthermore, hospital A is operated to serve a public rather than a private interest. Control of the hospital rests with its Board of Trustees, which is composed of independent civic leaders. The hospital maintains an open medical staff, with privileges available to all qualified physicians. Members of its active medical staff have the privilege of leasing available space in its medical building.

had sought medical services from individual hospitals. In some instances they had received treatment and had been charged for the services even though they were unable to pay. In other instances, they were refused medical services until such time as they were able to demonstrate a financial ability to pay.[4] Their complaint alleged that the Treasury officials, by issuing Revenue Ruling 69–545, had encouraged and are encouraging non-profit hospitals to exclude persons unable to pay for services, or to bill them and sue them for collection if they are admitted. The complaint also alleged that each of the hospitals was so financially dependent upon the favorable tax treatment it received by virtue of its "charitable" status, that it would not relinquish such status if required to provide free or reduced cost services to the poor to the extent of its financial ability as a condition to retaining this tax exempt status. The gravamen of plaintiffs' argument was that the IRS had violated the Internal Revenue Code by issuing Revenue Ruling 69–545 and thereby eliminating the obligation of non-profit hospitals to provide inpatient services to persons unable to pay as a condition for receiving charitable status under Sec. 501(c)(3) of the Code. Plaintiffs also argued that the 1969 ruling was legislative rather than interpretative in nature, and was therefore invalid because it was issued without the notice and comment period required by Sec. 553 of the Administrative Procedure Act.

The Treasury defendants moved to dismiss the suit on the grounds that the district court lacked jurisdiction because (1) plaintiffs lacked standing to challenge the activity of the IRS regarding the issuance of Rev.Rul. 69–545; (2) sovereign immunity barred the broad, declaratory and injunctive relief sought; (3) the suit was barred by the provisions of the Anti-Injunction Act; and (4) the suit was barred by the federal tax exception to the Declaratory Judgment Act. While these motions were pending, the Supreme Court accepted for review *Eastern Kentucky Welfare Rights Organization v. Simon*, 506 F.2d 1278 (D.C. Cir.1974) *cert. granted*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975), a case raising issues identical to those presented in the instant case. Pursuant to an agreement between the parties and the district court, all action on the present case was stayed pending the outcome of that decision. In July 1976, the Supreme Court, without reaching the merits, dismissed the case on the grounds that the plaintiffs lacked standing to sue. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

Even though the plaintiffs in *EKWRO* had been denied standing to challenge the promulgation of Rev.Rul. 69–545, the district court nevertheless concluded that plaintiffs had satisfied the Article III standing requirement here by alleging that the hospitals which caused their injuries were so financially dependent upon the fa-

4. Plaintiffs Refugio and Maria Lugo alleged that in 1973 Maria Lugo became ill, was admitted to the Medical College of Ohio Hospital for surgery, and was thereafter sued for $1,838.69 by the hospital, although they were unable to pay that amount, and in fact received partial assistance for payment of the medical bill from the local welfare department because of their indigency. Plaintiff Sanchez alleged that she was admitted to Wood County Hospital for delivery of a baby, and was thereafter required to sign a promissory note for the full cost of hospitalization before her discharge was authorized, although she at all times has been financially unable to pay that bill. Plaintiff Perez alleged that in 1974 he was sent to the emergency room in the Memorial Hospital of Sandusky County by medical personnel of the Sandusky Migrant Health Clinic for treatment, af-

ter exhibiting symptoms of a recurring heart ailment. Perez alleged that at the Memorial Hospital he was twice denied admission without any examination, and he was thereafter admitted to the Intensive Care Unit of St. Charles Hospital for myocardial ischema. Plaintiff Hudnell alleged that before the Medical College of Ohio Hospital would admit her son, plaintiff Jessie Navarro, Jr., for surgery, a deposit of $600.00 (later reduced to $200.00) was required. Hudnell alleged that she was not in a position to pay $200.00, and Navarro was ultimately admitted to Mercy Hospital in Toledo for the required surgery. The other plaintiffs alleged the performance of service by hospitals but an inability to pay the resulting charges. Each plaintiff, except Perez, also alleged that he or she was never advised of eligibility for free or reduced cost services.

vorable tax treatment of charitable contributions made to them, that they would admit persons who were unable to pay for treatment if so required by a court as a condition for the continuation of such favorable tax treatment. The court also overruled the other jurisdictional objections raised by the government in its motion to dismiss. In dismissing plaintiffs' claim on the merits, the district court adopted the conclusion of the majority opinion for the U. S. Court of Appeals for the D. C. Circuit in *EKWRO* that Rev.Rul. 69–545 is founded on a permissible definition of the term "charitable" and is not contrary to any express congressional intent. The district court also rejected plaintiffs' argument that Rev.Rul. 69–545 was a legislative ruling subject to the notice and comment provisions of the APA. The court accepted the position taken by the Internal Revenue Service that the rule was interpretative in nature, and therefore compliance with the rulemaking requirements of Sec. 553 was unnecessary. Since we believe *Eastern Kentucky* is dispositive of this case, we need only discuss the issue of standing.

## STANDING

■ The doctrine of standing serves both as a constitutional limitation on judicial power, deriving from the "case or controversy" requirement in Article III for exercise of the federal judicial power, and as a self-imposed prudential doctrine intended to monitor judicial review of public acts. The standing inquiry focuses on the party before the court, asking whether he has "such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Implicit in the concept of standing are the requirements of injury in fact and causation. To demonstrate the "personal stake"

in the litigation necessary to satisfy Article III, the party must suffer "a distinct and palpable injury," *Warth v. Seldin, supra*, at 501, 95 S.Ct. at 2206, that bears a "fairly traceable causal connection" to the challenged government action. *Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978), quoting *Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). When a party's standing to raise an issue is questioned, "the relevant inquiry is whether ... he has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization, supra*, 426 U.S. at 38, 96 S.Ct. at 1924. That injury must follow "as a result of the putative illegal conduct of the defendant." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). In sum, the standing test requires that plaintiffs allege a particularized injury concretely and demonstrably flowing from the action of the defendants which will be redressed by the remedy sought. Translated into specifics, the plaintiffs here must demonstrate (1) that they have suffered a distinct and palpable injury, (2) that the source of that injury is the issuance of Rev.Rul. 69–545; and (3) that invalidation of Rev. Rul. 69–545 would alleviate the injury (i. e. provide the opportunity to secure medical services free of charge). With these standards in mind, we now turn to the specifics of this case. Since it is a carbon copy of *EKWRO*, our task is narrowly defined: we must determine whether the plaintiffs' allegations are sufficient to overcome the standing hurdles which felled their counterparts in the Supreme Court.

■ The injury of which plaintiffs complain is their lack of access to free nonemergency hospital services. The complaint alleges that in some situations, where the plaintiffs received treatment, they were unable to pay because of their indigency.

On three other specific occasions, the plaintiffs alleged that they were altogether denied medical services solely on account of their inability to pay. In *Eastern Kentucky*, the Court assumed that some of the plaintiffs had been denied services because several of the hospitals serving the communities in which the plaintiffs resided did not serve indigents. In the context of that case, however, injury at the hands of a hospital was insufficient to establish a case or controversy because no hospital was named as a defendant: "a federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." 426 U.S. at 41–42, 96 S.Ct. at 1925–26. Plaintiffs have remedied that deficiency in the present case by including as defendants seven hospitals, several of which denied them medical services. This demonstration of deprivation is sufficient to constitute a concrete injury.[5] Yet the mere fact that certain named hospitals may have denied plaintiffs medical treatment does not, *ipso facto*, mean that this deprivation constitutes an injury sufficient to satisfy Article III when the challenge is to the action of a third party. *See Withers v. Teachers Retirement System*, 595 F.2d 1210 (2d Cir. 1979). Any "injury"

incurred must be a function of the alleged wrong; the injury must be caused by the challenged action. The absence of such a causal connection between the assumed injury and Rev.Rul. 69–545 was fatal to the plaintiffs in *Eastern Kentucky*. They had not established that, in fact, "the asserted injury was the consequence of the defendants' actions." 426 U.S. at 45, 96 S.Ct. at 1927. The Court went on to observe "in the instant case respondents' injuries might have occurred even in the absence of the IRS ruling that they challenge; whether the injuries fairly can be traced to that ruling depends upon unalleged and unknown facts about the relevant hospitals." 426 U.S. at 45, n.25, 96 S.Ct. at 1927, n.25. Plaintiffs have not avoided that pitfall here by specifically alleging facts explaining how the issuance of Rev.Rul. 69–545 led to their injuries. *See Boating Industry Associations v. Marshall*, 601 F.2d 1377, 1382 (9th Cir. 1979). There is no evidence in the record that the policy making authorities in the hospitals were even aware of the existence of the Ruling. Nor is there any evidence tending to show that the hospitals' admissions policies were altered or amended in response to the 1969 Ruling, leading to a decline in the dollar volume of services rendered to indigents. *See NCAA v. Califano*, 622 F.2d 1382, 1391 (10th Cir. 1980); *Ameri-*

---

**5.** We accept for purposes of the standing inquiry that three of the plaintiffs have established the requisite injury in fact. Therefore, we do not address whether the other plaintiffs who did, in fact, receive medical care and were subsequently billed for that treatment despite their inability to pay, have shown an injury sufficient to make out a case or controversy. *See Arlington Heights, supra*, 429 U.S. at 263–64 & n.9, 97 S.Ct. at 562 & n.9. We note, however, that we are not without doubt as to the standing of the plaintiffs which were denied treatment outright. Plaintiff Perez' complaint was that he was treated "abusively" in the Sandusky Memorial Hospital Emergency Room, that the physician on duty advised that "nothing was wrong with him," and that in fact he was ill and was later given emergency treatment at another hospital. Even under the challenged Rev.Rul., 69–545, Perez should have been treated in the Sandusky Memorial Hospital emergency room, assuming the Sandusky physician erred. Perez' allegations bear main-

ly, if not exclusively, on the enforcement of the Rev.Rul. 69–545 emergency room requirement—a subject not involved in this suit.

Second, the Medical College of Ohio allegedly refused to surgically treat plaintiff Hudnell's son until a cash deposit was made. Yet, as plaintiffs acknowledge, Medical College of Ohio is a state institution. As such, it received exemption from federal income taxation not because of any provision in Code Section 501(c)(3), but because of a limited implied immunity. Cf. *Massachusetts v. United States*, 435 U.S. 444, 454–460, 98 S.Ct. 1153, 1160–1163, 55 L.Ed.2d 403 (1978). Moreover, contributions to such a state-connected institution receive the blessing of tax deductibility not from any determination that such institution is organized and operated for "charitable" purposes, within the meaning of Section 170(c)(2)(B) of the Code, but from the provision allowing deductions for contributions "to or for the use of … a State." Code Section 170(c)(1).

can *Society of Travel Agents v. Blumenthal*, 566 F.2d 145, 148–49 (D.C.Cir.1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978). In sum, we see no connection between the government action and any third-party reaction. Absent some demonstration of a causal connection between the issuance of the Ruling and some identifiable deprivation of medical services to themselves, plaintiffs are, in effect, asking this court to rule on a general injury suffered by, in plaintiffs' estimate, millions of people which courts may not be empowered to rectify. *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 215–27, 94 S.Ct. 2925, 2929–2930 (1974).

Equally fatal to the plaintiffs' action in *Eastern Kentucky* was the Court's conclusion that it was only "speculative" whether an invalidation of the Ruling would afford relief to the injury:

> So far as the complaint sheds light, it is just as plausible that the hospitals which respondents may apply for service would elect to forego favorable tax treatment to avoid the undetermined drain of an increase in the level of uncompensated services. 426 U.S. at 43, 96 S.Ct. at 1926.

In *Eastern Kentucky* the plaintiffs alleged that the hospitals received substantial donations deductible by the donors. The Court observed that this allegation could support the inference that the hospitals were so financially dependent upon the favorable tax treatment afforded them that they would admit indigents if the court required such admission as a condition to receipt of tax exempt status. That inference, however, was found to be "speculative at best." 426 U.S. at 43, 96 S.Ct. at 1926. The government had shown that private philanthropy accounted for only 4% of private hospital revenues. The plaintiffs had introduced a statement by a hospital official emphasizing the importance to non-profit hospitals of the favorable tax treatment they received as charitable corporations. In view of this evidence, the Court concluded that the allegation that certain hospitals receive substantial charitable contributions, without more, did not establish the further proposition that those hospitals were dependent upon such contributions.

Plaintiff sought to avoid these shortcomings (the lack of requisite causation and redressability) by amending their complaint to allege that the hospitals were financially dependent upon the favorable tax treatment accorded "charitable" institutions (i. e. tax exempt status). This addiction, plaintiffs claimed, insured that hospitals would submit to a requirement that they provide free non-emergency care to indigents, to the extent of their financial ability, as a condition to retaining tax exempt status.[6] Plaintiffs sought to build a factual foundation for this proposition by introducing the hospitals' tax returns into evidence. That financial data shows that the hospitals received significant charitable contributions, which allegedly saved the hospitals from operating at a loss. Plaintiffs argue that if the hospitals were stripped of their tax

---

6. Plaintiffs have here postulated a new, quasi Hill-Burton test as that required for tax purposes. HEW requirements for Hill-Burton hospitals require a reasonable amount of free care within the financial ability of the particular institution. The Hill-Burton standards are set forth in the alternative: (1) one measure is 10% of the size of the grant; (2) a second measure is 3% of cost of operations (as defined in the regulation); (3) the third measure is unrestricted admission, with free and below cost service to all needing the service within eligibility guidelines. 42 C.F.R. Sec. 53.111(d). The lowest measure is the 10% of the size of the grant (which pertains for a twenty year period after the facility is operational. See 42 C.F.R. Sec. 53.111(a)). This new test is apparently designed by plaintiffs for the specific purpose of satisfying the two *Eastern Kentucky* standing tests, by first requiring hospitals to use a small amount of their surplus to provide free care for indigents (the extent of their financial ability), and then arguing that hospitals will give this small amount of free care rather than lose a greater amount of tax deductible contributions. The basic fallacy in this approach is that it mistakenly assumes that the defendant Treasury officials would have to utilize plaintiffs' financial ability test as the charitable tax standard if plaintiffs prevail in this case. There is absolutely no basis for such a standard in the tax laws.

exempt status, all other factors remaining static, the charitable contributions received by the hospitals would not have been made, since the encouragement of Sec. 170 would be absent. That is, if the hospitals were not tax exempt, they would not receive charitable contributions, thereby decreasing their revenues, and concomitantly, they would at the same time incur federal income tax liability, thus increasing their liabilities to an extent that the hospitals would have operated at a deficit.[7] Plaintiffs conclude from this calculus that the avoidance of a loss is sufficient economic incentive to convince the hospitals not to forego preferential tax treatment.

This conclusion of "dependency" is too facile for acceptance. It assumes that hospitals operate in a vacuum, that if a hospital is not tax exempt it will not receive any charitable contributions. This allegation is weakened by the parties' own stipulation that "(n)either the amount of these gifts, contributions or bequests nor the degree of tax motivation on the part of the donor can be measured or determined." The assumption of the plaintiffs that the economic benefits of gifts and contributions would be lost entirely if the hospitals' tax exempt status were taken away is not supported in the record. Indeed, the Supreme Court acknowledged as a "commonsense proposition" that dependence upon special tax benefits may vary from hospital to hospital." 426 U.S. at 43, 96 S.Ct. at 1926. In our view, the fact that a particular hospital may experience an excess of income over expenditures does not establish a probable dependency by that hospital on its federal tax exemption. *But cf. NAACP, Boston Chap. v. Harris,* 607 F.2d 515, 521 (1st Cir. 1979); *Committee for Full Employment v. Blumenthal,* 606 F.2d 1062, 1067 (D.C.Cir. 1979).

Plaintiffs' argument also assumes the existence of a *ceteris paribus* situation. Implicit in their reasoning is the belief that hospitals would not alter their financial affairs to reflect the loss of tax exempt status, thereby incurring significant tax liability. Common sense dictates, however, that if they were taxable, they would undoubtedly decrease net income and the tax thereon by intensive use of such methods as accelerated depreciation, investment credits, allocation of unrelated business expenses against formerly exempt function income, and careful cycling of purchases of inventory and capital items to offset income.

*Eastern Kentucky* requires a "substantial likelihood" that the release sought will actually remedy the wrong. 426 U.S. at 45, 96 S.Ct. at 1927. In a sense, from a hindsight perspective, the hospitals were "dependent" upon tax exempt status to avoid an economic loss. Retrospective deletion of certain factors from the financial picture, however, does not establish the essential element of difference lacking in *Eastern Kentucky* to show a current dependency upon tax exempt status. The plaintiffs merely state a reciprocal relationship—dependency—and then impose a retroactive hypothetical on the figures to conclude that tax exempt status, and indirectly Rev.Rul. 69–645, has something to do with the outcome. If a hospital were required to provide free non-emergency care in order to remain tax exempt, it might well pass up that status to avoid the increased costs incurred by providing an undetermined amount of free care. Therefore, even if plaintiffs prevailed, and even if they persuaded us that an injunction is warranted, they might be left with a phyric victory.

Furthermore, no evidence was adduced that a return to the pre-1969 status would

---

**7.** As an example, the Memorial Hospital of Sandusky County in taxable year 1976 had gross income of $7,802,016 and deductible expenses of $7,587,654 (included in which was $566,978 of uncollectible accounts), or a net income of $214,362. The plaintiffs conclude from this that the hospital's economic loss for that year if it were not tax exempt would be $136,011, $96,394 of which would have been the income tax it would have paid and $39,617 of which would have been charitable contributions which would not have been made by the various donors.

afford plaintiffs the relief they seek. Even if we were to invalidate Rev.Rul. 69–545 *and* assume that the IRS would return to its earlier Ruling, it still remains no more than conjecture that plaintiffs would receive the medical care they desire. Rev. Rul. 56–185 required a hospital to provide care for persons unable to pay only "to the extent of its financial ability," and stated that provision of a low level of free services was not conclusive evidence that a hospital had failed to meet that duty. Moreover, under the 1956 standard, a hospital seeking tax exemption was not compelled to render free services to indigents, but was only required to "furnish services at reduced rates which are below cost, and thereby render charity in that manner." Since the volume of indigent patients accepted would be a function of the hospital's financial policies, it would remain uncertain whether any particular applicant would be accepted. Even under a reversion to the old law, the plaintiffs could well have been denied services. *See EKWRO*, 426 U.S. at 42, 96 S.Ct. at 1926.

The relations between Rev.Rul. 69–545 and plaintiffs' injuries and the likelihood of meaningful redress are no greater here than in *Eastern Kentucky*. Accordingly, the decision of the district court that the plaintiffs have standing to maintain this lawsuit is hereby reversed.