Mildred Lea **LINTON**, by her next friend **Kathy ARNOLD**, on her own behalf and on behalf of all other persons similarly situated, Plaintiff–Appellee,

Belle **Carney**, by her next friend Mary **Kimble**, on her own behalf and on behalf of all other persons similarly situated, Intervening Plaintiff–Appellee,

v.

**COMMISSIONER OF HEALTH AND ENVIRONMENT, STATE OF TENNESSEE**, Defendant–Appellee,

St. Peter Villa, Inc. (91–5021); McKendree Village, Inc. (91–5022); Cedars Health Care Center, Inc. (91–5023); Brook Meade Health Care Center (91–5024); RHA/Sullivan, Inc. (91–5025); Presbyterian Homes of Tennessee, Inc. (91–5026), Movants–Appellants.

Nos. 91–5021 to 91–5026.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1992.

Decided Sept. 4, 1992.

Napoleon B. Williams, Jr., New York City, Gordon Bonnyman (argued and briefed), Nashville, Tenn., Pamela Ford Wright, Huntington, Tenn., for plaintiffs-appellees.

Charles W. Burson, Atty. Gen., Jennifer Helton Small, Asst. Atty. Gen. (briefed), Office of the Attorney General, Nashville, Tenn., for defendant-appellee.

John C. Lyell (briefed), Lyell, Seaman & Shelton, William M. Barrick (argued and briefed), Nashville, Tenn., for movants-appellants.

Before: NELSON and BOGGS, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

KRUPANSKY, Senior Circuit Judge.

Movants-appellants, six nursing homes licensed in the State of Tennessee (movants), have appealed the district court's denial of their individual motions to intervene in this action which were filed twenty-five days after the court had entered its final judgment on July 5, 1990, wherein it had adopted in its entirety a proposed plan drafted by the Tennessee Department of Health and Environment (TDHE) in compliance with a court order requiring it to remedy alleged violations of the Medicaid Act, 42 U.S.C. §§ 1396, *et seq.*, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

The State of Tennessee participates in Title XIX of the Social Security Act, 42 U.S.C. § 1396[1], for the purpose of operating its Medicaid program pursuant to Tenn. Code Ann. § 71–5–101 et seq. Approximately seventy percent of the cost of the Tennessee Medicaid program is paid by the Health Care Financing Administration (HCFA) of the United States Department of Health and Human Services. In return for receipt of federal subsidies, the State of Tennessee is required to administer its Medicaid program in conformity with a state plan which satisfies the requirements of Title XIX and regulations promulgated thereto.

Under Tennessee's Medicaid program, the TDHE is the single state agency responsible for administration of the program. The agency is administered under the direction of the defendant-appellee, the Commissioner of the TDHE. The program covers nursing home treatment at both the intermediate care[2] and skilled nursing levels[3]. An individual's eligibility for intermediate or skilled care coverage under the Tennessee Medicaid program is determined by financial capability and certain other individual characteristics, such as age and physical disability.

The TDHE is responsible for adopting a state plan which is consistent with federal regulations for

(A) ... the review by appropriate personnel of the appropriateness and quality of care and services furnished to recipients of medical assistance ...; and

(B) ... the function of determining whether institutions and agencies meet the requirements for participation in the program [as health care providers] under such plan....

42 U.S.C. § 1396a(a)(33).

In order for a facility to participate in the Tennessee State Medicaid program, it must execute with the State a Medicaid provider

**1.** The Social Security Act authorizes the expenditure of federal funds to enable states to furnish medical assistance to indigent individuals who are aged, blind, disabled, or members of families with dependant children.

**2.** Intermediate care is defined as institutional, health-related services above the level of room and board, but at a level of care below that of a hospital or skilled care. 42 U.S.C. § 1396d(c), (d) (1982).

**3.** Skilled care consists of care above the intermediate level but below the level of a hospital. 42 U.S.C. § 1396d(i) (1973).

agreement pursuant to 42 U.S.C. § 1396a(a)(27). The Medicaid provider agreement in the instant action incorporated a condition that in the event the parties were unable to agree upon any future modifying amendment to the agreement, either party "may cancel this agreement by providing the other party with thirty (30) days written notice of such intent."[4]

In December of 1987, the plaintiffs-appellees[5] initiated legal action against the TDHE and its director to enjoin its "limited bed policy"[6] which allegedly violated the federal "distinct part certification"[7] provision of the Medicaid Act and Title VI of the Civil Rights Act. The plaintiffs sought a preliminary injunction enjoining the TDHE from the continued implementation of its limited bed policy and petitioned for an order directing the Commissioner to provide adequate and timely notice to each Medicaid recipient of any proposed change or modification of his or her care level entitlement. In addition, the plaintiffs moved for class certification. The TDHE moved to dismiss the complaint or in the alternative, for summary judgment, contending that the contested policy did not violate the Medicaid "distinct part certification" provision or Title VI of the Civil Rights Act.

On January 5, 1988, the district court referred the instant action to the magistrate who issued a report on March 8, 1988, which recommended that the court grant the plaintiffs' motion for class certification and preliminary injunction because the TDHE's bed certification policy resulted in racial discrimination and denial of Medicaid recipients' rights to receive timely medical services. The magistrate recommended

---

4. An example of the pro forma State Medicaid provider agreement was submitted by Brook Meade Health Care Center in its Motion to Intervene.

5. On December 1, 1987, plaintiff-appellee, Mildred Linton (Linton), who suffered from rheumatoid arthritis initiated this action on behalf of herself and others similarly situated under the Rehabilitation Act of 1973 and Title XIX of the Social Security Act against the TDHE. Linton suffered from rheumatoid arthritis and had been a patient for four years at Green Valley Health Care Center (Green Valley) in Dickson, Tennessee. She received notice from Medicaid that she no longer qualified to receive skilled nursing care and would have to move to another nursing home to receive intermediate level care. Green Valley provided both skilled and intermediate level care, and the bed which Linton occupied was certified for both levels of care. However, Green Valley was unwilling to care for her at the intermediate care level of reimbursement. Because Green Valley had reserved the right to decertify Linton's bed from Medicaid intermediate care participation, Linton was compelled to transfer to another facility.

The second plaintiff-appellee, Belle Carney (Carney), requested intervention on December 11, 1987. She sought to represent a class of Medicaid applicants who were adversely affected by the limited bed certification policy and added a claim under Title VI of the Civil Rights Act of 1964 charging that the limited bed certification policy authorized by the TDHE adversely impacted minority Medicaid applicants.

6. Under the limited bed policy, the TDHE, at the provider's instructions, certified for Medicaid use a limited component of beds for either intermediate level or skilled nursing care in nursing home facilities. The TDHE often certified beds for intermediate level care in facilities which provided both skilled and intermediate care even though the beds were not in a separate physical unit or wing but were intermingled with noncertified beds in the facility. A single bed in a semi-private room could be "spot-certified," although it was in a unit with noncertified beds providing the same level of care. Plaintiffs charged that the limited bed policy permitted Medicaid certified facilities to reclassify their certified beds for noncertified use to accommodate the needs of higher paying private residents. Accordingly, the providers admitted private pay patients before those Medicaid recipients who either had applied earlier to the same facility or had a greater need for care, causing a large number of Medicaid patients to experience serious placement problems and substantial delays in obtaining nursing home care. Moreover, plaintiffs argued that the certification policy triggered involuntary transfers of Medicaid recipients when these patients converted from private pay to Medicaid status or were reclassified from skilled nursing to intermediate level reimbursement due to the unavailability of certified beds at the appropriate care level.

7. Distinct part certification has been defined by the Department of Health and Human Services as a certified unit of a health care facility, other than a facility which provides only intermediate care, that is a separate unit distinguishable from non-certified units and independently operated to provide intermediate-level health care solely to Medicaid recipients. HCFA *Medicare/Medicaid State Operations Manual* § 2110.

that the court deny the defendant's motion to dismiss and that the Commissioner of the TDHE develop a remedial plan to redress the effects of discrimination and implement a full-certification policy of all beds at all Medicaid certified nursing homes.

In an attempt to settle the dispute, the State drafted a proposed plan in July of 1988 (1988 State plan) which was submitted for review to the Tennessee Health Care Association (THCA), an association in which the movants were and are members. One of the provisions of the 1988 plan, referred to as the "opt-out" provision, stated that Medicaid certified facilities which failed or refused to adopt the federal standards for continued Medicaid reimbursement would be decertified and its Medicaid patients would be transferred automatically to another Medicaid certified facility. However, those facilities which elected to terminate their participation in the program but agreed to continue to meet Medicaid standards on an interim basis would continue to be certified to receive reimbursement for the care of any remaining recipients until the last of those Medicaid patients were voluntarily transferred to another facility. THCA provided the Board of Directors (Board) and its Government Relations Committee (Committee) with a written and oral summary of the 1988 State plan and subsequently drafted and submitted to the State an alternative plan for consideration.

In a Memorandum and Order dated October 14, 1988, the district court adopted, in part, the magistrate's report and recommendation of March 18 and granted the plaintiffs' motion to certify the action as a class action. However, the court denied the plaintiffs' request for a preliminary injunction because it concluded that an injunction would cause substantial harm to Medicaid health care recipients, i.e., if nursing homes were compelled to certify all of their beds for Medicaid use, it was likely that some providers would immediately "opt-out" of the program and, as a result,

patients residing in those homes would be subject to severe "transfer trauma." The court reserved consideration and resolution of the Medicaid Act and Title VI substantive claims.

On April 23, 1990, the district court filed findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure disposing of the remaining substantive issues. It concluded that the Tennessee limited bed certification policy was in conflict with the federal "distinct part certification" policy and accordingly violated the Medicaid Act and Title VI. The court ordered the TDHE to submit a plan that would redress the disparate impact on minority Medicaid patients' access to qualified nursing home care and, in turn, would prevent or mitigate provider attrition.

On June 1, 1990, in accordance with the court order, the TDHE submitted a proposed remedial plan to the district court (1990 State plan) which required participating Medicaid providers to certify 100% of their beds for Medicaid use and included three sets of regulations concerning patient admission and discharge procedures.[8] Most significantly, the 1990 State plan incorporated a "lock-in" provision, which materially altered the "opt-out" provision of the initial 1988 State plan that had been circulated to the THCA and its members. The "lock-in" provision required that those facilities which elected to terminate their involvement in the Medicaid program would be required to notify the TDHE of their intent to do so. After notification of their intent to discontinue participation in the Medicaid program, those facilities would no longer be required to accept Medicaid recipients as residents. However, they would be prohibited from transferring Medicaid recipients who were already residents of the facilities at and prior to their notice of termination unless the residents voluntarily elected to transfer to another Medicaid-certified facility. Moreover, facilities which "opted-out" would not be permitted to terminate their Medicaid provider

---

**8.** The State specifically reserved the right to modify the 1990 State plan to comply with future amendments of federal and state Medicaid law and any HCFA directives.

agreements and become decertified until the last of their Medicaid patients were "lawfully" transferred or discharged from their facilities. The THCA did not receive a copy of the modified proposed 1990 State plan or notice of the material changes therein until it was filed with the district court on June 4, 1990. Subsequently, the THCA timely filed objections to the plan supported by an *amicus curiae* brief.

When the district court adopted the 1990 State plan in its entirety on July 5, 1990,[9] the THCA immediately obtained a commitment of financial and legal assistance from the American Health Care Association and employed an attorney for the purpose of representing any member facility that was desirous of intervening in this action. On July 30, 1990, the six appellant nursing homes moved to intervene and appeal the July 5, 1990 court order. The district court denied the motions on August 27, 1990 and concluded, in a memorandum opinion issued on December 11, 1990, that the movants lacked standing and their motions to intervene were untimely filed. The movants appealed the district court's denial of their motions to intervene on December 21, 1990.

Both reasons advanced by the court in denying the appellants' motions to intervene are jurisdictional and, if factually and legally supported by the record, are independently dispositive of the instant action.

■■ To determine the movants' standing to invoke the Sixth Circuit's jurisdiction to review these post-judgment motions to intervene pursuant to Article III of the Constitution, this court's attention is directed to *Diamond v. Charles*, 476 U.S. 54, 62, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986), wherein the United States Supreme Court stated that

> [t]he presence of a disagreement, however, sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements. This Court consistently has required, in addition, that the party

seeking judicial resolution of a dispute "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct" of the other party.

*Id.* at 62, 106 S.Ct. at 1703. (citations omitted). *See Yniguez v. Arizona*, 939 F.2d 727, 731 (9th Cir.1991) (post-judgment intervention contingent upon showing that intervenor fulfilled requirements of Article III); *see also United States v. Western Electric*, 900 F.2d 283, 310 (D.C.Cir.1990) (pre-judgment intervenor, in order to continue suit on appeal in absence of parties, must satisfy Article III). Accordingly, Article III standing requires an allegation of an injury-in-fact, fairly traceable to the challenged conduct, and that redress of the injury will be afforded by the requested relief. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Lugo v. Miller*, 640 F.2d 823, 827 (6th Cir.1981). While the necessary injury is not susceptible to precise definition, it must be "distinct and palpable," *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and not merely hypothetical, abstract, or conjectural. *Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). An economic injury which is traceable to the challenged action satisfies the requirements of Article III. *Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta*, 713 F.2d 1221, 1225–26 (6th Cir.1983).

■ Without implicating the merits of the instant action, a review of the Medicaid provider agreement, the Medicaid Act, and the regulations promulgated thereto indicates that the movants have satisfied Article III standing requirements. The movants have asserted that they had contractual, statutory, and economic interests which have been and continue to be directly injured by the 1990 State plan "lock-in" provision.[10] They have alleged that the 1990

---

9. The State reserved its right to appeal issues previously joined, as well as remedies imposed by the district court in the event the proposed plan was not adopted in its entirety or was modified in any respect by the district court.

10. The movants asserted additional injuries from the 1990 State plan; however, this court concludes that only the alleged injuries arising from the "lock-in" provision satisfy Article III criterion.

"lock-in" provision has precluded them from voluntarily terminating their participation in the Medicaid program, a contractual right which had been guaranteed by the Medicaid provider agreement executed with the State. Moreover, they have argued that their participation in the Medicaid program had been voluntary and that the 1990 State plan has allegedly forced them to continue indefinitely the care of all Medicaid recipients in residence at the time the providers notified the TDHE of their intent to terminate their provider agreements, all in direct conflict with the Medicaid Act. *See* 42 U.S.C. §§ 1396a(a)(23), (27); 42 C.F.R. §§ 442.1, 442.10 *et seq.; Minnesota Ass'n of Health Care v. Minnesota Dept. of Public Welfare,* 742 F.2d 442, 446 (8th Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); *Newfield House v. Massachusetts Dept. of Public Welfare,* 651 F.2d 32, 35 (1st Cir.1981), *cert. denied,* 454 U.S. 1114, 102 S.Ct. 690, 70 L.Ed.2d 653 (1981). Finally, the movants have asserted that the "lock-in" provision has caused and continues to cause economic injury because they would be denied the right to allot the beds occupied by those Medicaid residents here in controversy to non-Medicaid residents financially capable of paying higher occupancy rates.

It is thus the conclusion of the petitioner-appellants that the "lock-in" provision of the 1990 State plan violates the movants' contractual and statutory right to elect voluntary participation in the Medicaid program resulting in economic injury. Accordingly, movants have pleaded a cognizable injury-in-fact, together with probable illegal State conduct which could be redressed by their intervention and appeal of the 1990 State plan.

■ Having concluded that the movants have standing to invoke jurisdiction of the appellate court under Article III of the Constitution, this court moves next to consider if movants may intervene as a matter of right pursuant to Fed.R.Civ.P. 24(a).[11] In *Grubbs v. Norris,* 870 F.2d 343, 345 (6th Cir.1989), this circuit set forth the following criteria to resolve an individual's right to intervene in a lawsuit as a matter of right:

[T]he proposed intervenors must meet four criteria before intervention by right is permitted: (1) the application for intervention must be timely; (2) the applicant must have a substantial, legal interest in the subject matter of the pending litigation; (3) the applicant's ability to protect that interest must be impaired; and (4) the present parties do not adequately represent the applicant's interest. The proposed intervenor must prove each of the four factors; failure to meet one of the criteria will require that the motion to intervene be denied.

The trial court's action in denying the movants' applications to intervene as untimely is reviewed under an abuse of discretion standard. *Id.* Elements two through four of Rule 24(a) are reviewed de novo. *Id.*

In determining whether an application for intervention as of right meets the timeliness requirements of Fed.R.Civ.P. 24(a), a court is directed to consider: (a) the point to which the suit has progressed; (b) the purpose for which intervention is sought; (c) the length of time preceding the application during which the applicant knew or reasonably should have known of its interest in the case; (d) prejudice to the original parties due to the failure of the applicant to apply promptly for intervention upon acquiring the knowledge of its interest; and (e) any unusual circumstances of the case. *Triax v. TRW, Inc.,* 724 F.2d 1224, 1228 (6th Cir.1984); *Michigan Ass'n for Retarded Citizens v. Smith,* 657 F.2d 102, 105 (6th Cir.1981). The United States Supreme

---

11. Rule 24(a) provides in pertinent part:

Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Court has mandated that a post-judgment application to intervene must be filed "promptly," in view of all the circumstances; a factor of major significance in this connection is whether the application has been filed within the time period prescribed for purposes of filing an appeal pursuant to Fed.R.App.P. 4(a). *United Airlines, Inc. v. McDonald,* 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977); *Triax,* 724 F.2d at 1229.

In the instant action, the district court abused its discretion when it concluded that the appellants had untimely filed their applications to intervene. The court incorrectly placed undue emphasis on the fact that the movants did not file their applications to intervene until July 30, 1990, approximately two and one-half years after the suit was initiated. Since the post-judgment motions to intervene were filed 25 days after the district court entered its final judgment, their applications were made within the 30–day time period prescribed for purposes of filing a notice of appeal.

A review of the remaining *Triax* time factors indicates that the movants' motions to intervene were not untimely. First, the movants have asserted a legitimate purpose for intervention, i.e., a judicial review of the "lock-in" provision incorporated into the adopted 1990 State plan and a determination of the State's alleged contractual and statutory breaches of the Medicaid provider agreement. Under the Medicaid provider agreement, the providers had the option to terminate participation in the Medicaid program. However, the new 1990 State plan adopted by the district court on July 5, 1990 required the movants to retain Medicaid patients even though they elected to withdraw from participation in the Medicaid program in derogation of their contractual and statutory rights.

Second, the movants had no reason to intervene in the instant action so long as they believed that the TDHE and the trial court would protect their interests or until

the district court adopted the 1990 State plan in its entirety. After the TDHE filed its proposed 1990 State plan, the nursing home industry filed formal objections to the plan supported by an *amicus curiae* brief. Because they were not privy to the terms and conditions of the proposed 1990 State plan "lock-in" provision until after the plan had been filed in the district court, the movants could not have reasonably known prior thereto that this provision would require them to participate indefinitely in the Medicaid program. Although the district court had the opportunity to modify the "lock-in" provision which was adverse to the movants' contractual, statutory, and financial interests, it elected to adopt the proposed plan in its entirety. Accordingly, the movants proceeded expeditiously to protect their interests by seeking intervention to appeal the district court's final order and filed their motions to intervene 25 days after the court entered its final judgment adopting the 1990 State plan. Therefore, it was not unreasonable for the movants to initiate this timely appeal after the district court finally adopted the plan on July 5, 1990.

Third, there is no prejudice to the State or the original plaintiffs in this action arising from the failure of the movants to apply for intervention upon acquiring the knowledge that their interests were being adversely affected because intervention is in the interest of all parties and will avoid protracted litigation.

Finally, unusual circumstances militate in favor of intervention. The instant action was initiated and tried on the issue of the legality of the State's limited bed policy which implicated only one of the six movants.[12] Therefore, the movants did not have a significant interest in the litigation until the 1990 State plan was *ultimately adopted in its entirety by the district court in July of 1990.*

Accordingly, the movants' applications to intervene were not untimely.

---

**12.** R.H.A./Sullivan, Inc. was the only movant who utilized a limited bed policy which was the subject of the instant action. The other mov-

ants were 100% Medicaid certified, however, they preferred private pay residents over Medicaid recipients as a way to defray losses.

A de novo review of the remaining Rule 24(a)(2) factors supports this court's conclusion that the district court incorrectly denied the movants' applications to intervene in this action. First, Rule 24(a)(2) requires a would-be intervenor to demonstrate that it has a "significantly protected interest" in the pending litigation. *Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971); *Jansen v. City of Cincinnati*, 904 F.2d 336 (6th Cir.1990); *Cf. Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (Medicaid Act creates a right enforceable by health care providers to challenge the adequacy and reasonableness of reimbursement rates). The district court in the instant action concluded that the movants did not have a significantly protectable interest in this litigation and was concerned that the central thrust of their appeal "would be an attempt to convert this case into a lawsuit involving the adequacy of Tennessee's Medicaid reimbursement for nursing homes." However, the court failed to recognize the alleged impairment of the movants' contractual and statutory rights to discontinue their voluntary participation in the Medicaid program, as well as the economic impact of the "lock-in" provision.

█ In addition to the alleged contractual, statutory, and economic interests already asserted by the movants, they also have argued that the stare decisis effects of the July 5, 1990 district court Order has provided them with sufficient interest to intervene in the instant action and prove that their interests will be impaired if appellate review of the 1990 State plan is denied. *Jansen*, 904 F.2d at 342. The applicants for intervention in *Jansen* were parties to a consent decree that arose from a case alleging racial discrimination in the employment of firefighters. *Id.* at 338. The proposed intervenors sought to represent the class of black applicants and employees that had negotiated and signed the consent decree. *Id.* at 341–42. At stake in the litigation was the proposed intervenors' interest in continuing affirmative action under the consent decree:

> The subject matter of the litigation requires an interpretation of the consent decree negotiated by the proposed intervenors and the City when they were in the midst of an adversarial relationship. Therefore, as parties to the consent decree, the proposed intervenors have a significant legal interest in its interpretation.

*Id.* at 342.

Moreover, the *Jansen* court noted that the disposition of that action in an adverse manner "would impede the proposed intervenors' ability to enforce the provisions of the consent decree regarding hiring decisions, use of separate eligibility lists and maintenance of the minority composition goals." *Id.* The appellate court reasoned that had the district court resolved that the use of race conscious hiring practices were foreclosed by the consent decree, the proposed intervenors would have been precluded from pursuing any subsequent enforcement action. *Id.*

In the instant action, the district court's acceptance of the 1990 State plan allegedly altered the terms of the provider agreement between the State and the movants. By denying the proposed intervenors the right to intervene, the district court precluded appellate review of the 1990 State plan which would materially prejudice the movants and prevent them from challenging the terms of the 1990 State plan in future litigation due to the application of stare decisis. Accordingly, the movants have carried their burden by proving that their interests will be impaired if appellate review of the 1990 State plan is denied.

█ Finally, the movants must prove that they were inadequately represented by the existing original parties. *Meyer Goldberg, Inc. v. Goldberg*, 717 F.2d 290, 293 (6th Cir.1983). This burden of proof is minimal because it is sufficient that the movants prove that representation may be inadequate. *Trbovich v. UMWA*, 404 U.S. 528, 539, 92 S.Ct. 630, 636, 30 L.Ed.2d 686 (1972). The district court in the instant action correctly concluded that the TDHE acted as both a regulator and a purchaser of movants' services thereby creating in-

1320

herent inconsistencies between movants' interests and those of the State sufficient to warrant a finding that the TDHE representation of movants' interests may have been inadequate.

Accordingly, this court concludes that the movants may intervene in the instant action as a matter of right pursuant to Fed.R.Civ.P. 24(a).

After a review of the record in its entirety, and the briefs and arguments of counsel, the judgment of the district court denying the movants' motions to intervene is hereby REVERSED and the case is REMANDED to the district court for further proceedings not inconsistent with this opinion.