NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0205n.06

No. 11-4442

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Mar 18, 2014
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| H. DAVIS, et al., | ) |
|     Plaintiffs-Appellees, | ) |
| | ) |
| v. | ) |
| | )    ON APPEAL FROM UNITED STATES |
| LIFETIME CAPITAL, INC., et al., | )    DISTRICT COURT FOR THE SOUTHERN |
|     Defendants, | )    DISTRICT OF OHIO |
| | ) |
| NATLIS CAPITAL, LLC, | ) |
|     Intervenor-Appellant. | ) |

Before:  BOGGS and McKEAGUE, Circuit Judges; and CARR, District Judge[*]

CARR, District Judge:  Intervenor-Appellant, Natlis Capital, LLC (Natlis), appeals from an order denying its motion to intervene under Federal Rule of Civil Procedure 24(a) and (b)(1). Natlis seeks to intervene in H. Thane Davis's suit against Lifetime Capital, Inc. (Lifetime). In the underlying action, Davis alleged fraud and breach of contract against Lifetime.[1] At Davis's request the court appointed a receiver, Thomas Moran, to protect Lifetime's insurance policy portfolio pending a decision on the merits. Natlis seeks to intervene to recover money Moran seized while managing Lifetime's portfolio.

---

[*] The Honorable James G. Carr, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

[1] Davis amended his complaint to add David Svete as a defendant on March 29, 2004. However, the trial court terminated David Svete's participation in the litigation on February 27, 2009.

1

Appellees contend that Natlis lacks constitutional standing and capacity to sue. Even if Natlis does not lack standing or capacity, appellees argue the lower court properly denied Natlis's motion to intervene under both Fed. R. Civ. P. 24(a) and (b)(1) because it was untimely.

We hold that Natlis was not required to have constitutional standing to intervene, and that its motion meets the requirements of Fed. R. Civ. P. 24(a). Accordingly, we reverse the lower court's decision denying intervention and hold Natlis has a right to intervene.

We remand the case to the district court to determine whether Natlis has capacity to sue and, if so, to determine the merits of Natlis's conversion claim. Contrary to appellees' contention, the record does not reflect that they raised the issue of Natlis's capacity to sue in the lower court.[2]

---

[2] Generally, capacity is considered an affirmative defense, not a jurisdictional issue. *Brown v. Keller*, 274 F.2d 779, 780 (6th Cir. 1960). *See also E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 936 (2d Cir. 1998) (lack of capacity is not generally considered jurisdictional and is therefore waived if not specifically raised); *Erwin v. Barrow*, 217 F.2d 522, 524 (10th Cir. 1954) (question is not one of jurisdiction but rather capacity to sue). Under Fed. R. Civ. P. 9(a)(2), a party seeking to raise the issue of capacity must specifically assert lack of capacity and support its assertion with facts. If a party is not a corporation or an individual and the party is asserting a state-law claim, then the law of the state where the court is located determines capacity. Fed. R. Civ. P. 17(b)(3).

A court may exercise its discretion to address an issue raised for the first time on appeal if it is purely legal and disposing of the issue serves the end of judicial economy. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Contrary to the appellees' contention, the question of capacity was not raised in the memorandum opposing Natlis's motion to intervene. We think it would be unwise for this court to consider the issue of capacity for the first time on appeal. Since Natlis is asserting a state law claim for conversion against the receiver, state law will govern the issue of Natlis's capacity.

The question of capacity is a mixed question of law and fact, and state law on the issue of capacity generally, and under Ohio Revised Code § 1705.58 specifically, is not clear. *Compare Patterson v. V&M Auto Body*, 63 Ohio St. 3d 573, 574 (1992) (stating that court should strike complaint *sua sponte* from its docket if it finds plaintiff lacks capacity); *Sta-Rite Indus. v. Preferred Pump & Equip.*, 2008 WL 3874676, at *2 (N.D. Ohio Aug. 14, 2008) (interpreting Ohio law to find that lack of capacity for failure to obtain license cannot be cured); *with P.K. Springfield, Inc. v. Hogan*, 86 Ohio App. 3d 764, 771 (1993) (capacity defense may become moot if opposing party does not object to lack of capacity and corporation obtains necessary license prior to dispositive motion); *Capital City Energy Grp., Inc. v. Kelley Drye & Warren LLP*, 2011 WL 5175617, at *4 (S.D. Ohio Oct. 31, 2011) (interpreting Ohio law to find that lack of capacity can be cured during pendency of the proceeding, even if filed after motion to dismiss).

Natlis did not present evidence on the issue of its capacity in the lower court because neither Davis nor Moran raised the issue in opposition to Natlis's motion to intervene. Assuming Natlis does have a capacity issue, if it becomes current in its state-law filings, then it may be able to cure the deficiency. After Natlis has an opportunity to present evidence on the issue of capacity, the lower court should make the determination of whether such evidence is sufficient under O.R.C. § 1705.58.

## Factual Background

### 1. Overview

Natlis and Lifetime were viatical investment companies.[3] David Svete incorporated Lifetime in 1997 and Natlis in 1999.

Natlis is one of an unknown number of entities Svete formed or allegedly caused to be formed after forming Lifetime. Natlis's ownership is complex. Svete's father, William Svete (William), is the president of Gold Finch Investments. Gold Finch Investments is the general partner of the Svete Family Limited Partnership and DWS Enterprises Limited Partnership. The Svete Family Limited Partnership owns Natlis.

The extent of Natlis's actual business operations and its connection to Lifetime is unclear. At its inception, Svete, William, and Kathleen LaFrance managed Natlis. On April 1, 2000, Natlis entered into an agreement to sell insurance policies to Lifetime. Less than one year later, on October 26, 2000, Lifetime terminated the agreement.

Both Svete and William resigned from Natlis on November 5, 2001.

Contrary to appellees' contention, there is no evidence in the record that Natlis ever actually sold any policies to Lifetime under the agreement. Similarly, there is no evidence Natlis received any other loans or payments from Lifetime.

The same cannot be said of other entities associated with Svete. It is clear that from 1997- 2001, Svete defrauded Lifetime investors. He transferred money from Lifetime's premium-reserve account to various entities, trusts, and bank accounts as "loans" and

---

[3] Under a viatical investment agreement, patients (viators) sell to investors the right to receive the benefits under their life-insurance policies when they die. The viator benefits by receiving money in advance of death and investors, assuming the viator dies within the quoted life expectancy, earn higher returns than those realized on many other investments. Viaticals are legitimate insurance products in all states.

"payments" for a variety of services.

On January 1, 2004, a jury indicted Svete and seven co-conspirators on charges associated with the fraudulent transfers. The government alleged Svete and his co-conspirators funneled money from Lifetime's premium-reserve account to a specific group of entities. However, the government did not allege that Natlis received funds, and William was not indicted as a co-conspirator.[4]

On February 19, 2004, shortly after the indictment, Davis, one of an estimated 3,000 Lifetime investors, sued Lifetime. Davis represented that Lifetime had amassed a portfolio of insurance policies with a face value in excess of $150,000,000. Davis made two allegations in his complaint: 1) Lifetime and Medical Underwriters fraudulently misrepresented viators' life expectancies, and 2) Lifetime misrepresented to investors that it escrowed enough investor money to pay policy premiums, in breach of its contracts with investors.

Davis sought damages covering the value of the policies that Lifetime allowed to lapse and the value of policies likely to lapse in the near future because Lifetime had insufficient funds

---

[4] The indictment alleged that between 1997 and 2001 Svete and seven co-conspirators transferred approximately $20,000,000 in funds from Lifetime to a select group of entities that Svete created or controlled. Svete and his co-conspirators allegedly created sham loans, marketing agreements, and service contracts to funnel money from Natlis to these entities. William was not indicted as a co-conspirator. Although Natlis was among nearly twenty entities listed in the background portion of the indictment, the charging portion of the indictment did not allege that Lifetime ever actually transferred any money to Natlis.

The indictment did allege, however, that Svete and his co-conspirators had entered into sham loans and agreements with other entities. The indictment alleged Svete and his seven co-conspirators caused the withdrawal of $15,000,000 for the benefit of Omni; $250,000 for the sale of Medical Underwriting to another Svete associate; $1,585,970 to an overseas account at the Bank of Finance; $75,000 for the sale of Medical Underwriting back to Svete; an unknown amount for a consultant agreement between Lifetime and Sovereign; $1,300,000 to the Bank of Finance; $500,000 a month to Svete under a consultant agreement; various amounts to Svete for a sale of marketing rights; $2,000,000 via a promissory note in favor of Svete; $2,000,000 for rights to market viatical settlements; $3,000,000 for a loan to Volcano company; $3,000,000 to Svete from Volcano; and $1,967,750.93 to Bluecrest.

Svete and one co-conspirator were found guilty and Svete's conviction became final in 2008 after a rehearing *en banc*. *U.S. v. Svete,* 521 F.3d 1302 (11th Cir. 2008).

to pay premiums. In addition, Davis asked the court to appoint Moran to manage the remaining policies in Lifetime's portfolio and prevent further losses to investors while the suit was pending.

To support his fraud and contract claims and request for a receiver, Davis informed the court of Svete's recent indictment. He incorporated, by reference, the thirty-page grand-jury indictment issued approximately one month earlier in the United States District Court for the Northern District of Florida.

Lifetime's president, Phyllis Lucas, consented to Moran's appointment as receiver for Lifetime.

Moran's mandate as receiver was to manage premium payments and thereby salvage, to the greatest extent possible, Lifetime's remaining insurance policy portfolio. To do so, Moran had to maintain premium payments on the policies to prevent their lapse and the ensuing loss to investors. He had three options for obtaining money to pay the policy premiums: 1) get loans from financial institutions, 2) use money from policies in Lifetime's portfolio that matured and provided payouts during the receivership, or 3) track down money wrongfully transferred from Lifetime's premium-reserve account to other accounts and entities prior to the receivership.

The final option for obtaining funds was arguably the most difficult.[5] Moran tried unsuccessfully to sue and recover money from the companies specifically alleged to have received funds.[6]

---

[5] To recover money lawfully from other businesses Moran would have had to trace funds from Lifetime's premium reserve account to the trusts and other accounts that allegedly received funds. There is no evidence in the record that Moran ever independently reviewed Lifetime's transactions with these entities. Instead of independently investigating the transfers, it appears Moran cut and pasted the allegations in the criminal indictment into his civil complaint. Regardless, Moran's suit did not make it past the complaint stage. The trial court dismissed the action because Moran failed to serve any of the entities. *See infra* Section 2. B.

[6] *See, supra,* note four for the alleged recipients listed in the federal indictment.

Natalis was not sued, as Moran lacked sufficient facts to form a complaint against Natlis. Nonetheless, in 2005 he seized the company's funds for the Lifetime receivership. His first request to "modify" the receivership order misrepresented that Natlis and other entities were among those actually alleged to have received Lifetime funds. *See infra* Section 2. A. ii. On the basis of this representation, the court gave Moran authority to seize the funds of any entity Svete created regardless of whether it had any ties to Lifetime.

In 2005, Moran seized $100,000 Natlis had on deposit with the Florida Secretary of State. In February 2008, William, acting on behalf of Natlis, sought to intervene in the suit to recover the funds. At that time, the receivership estate still contained $7,000,000.

The lower court waited three years and eight months to rule on Natlis's motion to intervene.

## 2. Receivership Orders, Receiver's Actions, Receivership Finances, Investor Claim Process

Once on notice of the opportunity and need to intervene, an intervenor must seek intervention in a timely manner. Determination of whether a proposed intervenor knew of or should have known of its interest in litigation is fact intensive, as is the issue of whether intervention would prejudice existing parties. Thus, it is necessary to discuss in detail: 1) the receivership orders; 2) Moran's acts as receiver; 3) the receivership finances; and 4) the investor claims process.

### A. The Scope of the Receivership Order

### i. Initial Order of Appointment

Magistrate Judge Sharon Ovington entered the Initial Order of Appointment on February 20, 2004. The language of the first receivership order gave Moran authority to manage Lifetime's life

6

insurance policies and other assets. The order prohibited third-party interference with Moran's possession and control of Lifetime's assets and prevented suits against Lifetime or Moran.

The order provided, *inter alia*:

This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind . . . of LifeTime, including, without limitation, all viatical and life settlement insurance policies, including beneficial interests therein and proceeds thereof, comprising the LifeTime Portfolio (hereinafter "Receivership Assets").

Receivership assets shall include, but not be limited to, all property of whatsoever nature . . . which has been acquired with or through funds or proceeds of LifeTime. The Receivership Assets specifically include, without limitation, all viatical or life settlement contracts with respect to which LifeTime or its affiliates are a party thereto, and all life insurance policies related thereto.

. . . The receiver shall have complete and exclusive control, possession, and custody of all Receivership Assets.

The receiver is hereby authorized and empowered to take any and all action the Receiver may deem necessary or prudent for the preservation, maintenance, and administration of the LifeTime Portfolio . . . including, without limitation, the following:
    (a) . . . Securing financing for payment of insurance policy premiums
    (b) Payment of premiums . . .
    (c) Monitoring the viators . . .
    (d) [R]eceive notice of the death of viators . . .
    (f) [C]ommunicate with insurance companies
    (g) . . . [Sell or liquidate] all or part of the LifeTime Portfolio"

All persons . . . are stayed from:
    (i) Commencing . . . any suit . . . against the Receiver or the Receivership Assets, except with the prior permission of the Court;
    (iv) Doing any act or thing whatsoever to interfere with the Receivership Assets . . .

Until further order of this Court, this Order prohibits the prosecution of any civil action or other proceeding against LifeTime . . .

The Receiver is hereby authorized to institute, defend, compromise or adjust . . . actions . . in courts . . .

The Receiver shall have the authority to issue subpoenas to compel testimony of

7

persons or production of records . . .

The Receiver and his agents are entitled to rely on all outstanding rules of law and court orders and shall not be liable to anyone for their own good faith compliance with any order . . . except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties. The Receiver and his agents shall be indemnified and held harmless out of the Receivership Assets for all costs and expenses, including reasonable attorney fees, incurred as a result of such actions.

### ii. First Amended Order

On March 11, 2004, Moran filed his first motion to "clarify" the receivership order. He requested the court to expand his powers to include explicitly "Lifetime funds" in the possession of other business entities. Moran relied solely on the allegations in the grand jury indictment to support the extension of his authority to other entities' assets.

The motion provided, *inter alia*:

. . . The Receiver has learned of . . . the existence of certain transactions which resulted in the apparent removal of significant funds from LifeTime accounts to the detriment of LifeTime's investors. All of these activities are believed to have occurred under the direction, either direct or indirect, of David W. Svete . . . and are significantly detailed in the grand jury indictment issued in the United States District Court for the Northern District of Florida, Pensacola Division.

According to the allegations contained in the indictment against Svete and various other past or present officers, directors or employees of LifeTime and its affiliates, through a series of entities, all of which were controlled, either directly or indirectly by Svete, orchestrated a number of complex transactions, all of which were designed to legitimize the removal of funds from LifeTime. The affiliated entities specifically identified in the indictment include, without limitation: Wealth Strategies, Inc., . . . A.C. Financial, Inc., . . . Sovereign Enterprises, Inc., . . . which name was later changed to Waterford International, L.L.C.; Medical Underwriting, Inc., . . . Natlis Capital, Inc., . . . Madison Air, Inc., . . . Bluecrest Group, . . . Volcano Enterprises, . . . Omni Limited, . . . Banque De Financier, LTD., . . . Marble Capital Partners, Inc., . . . and Umbrella Capital . . .

It is the opinion of the Receiver that, to effectively and properly perform his duties

8

and responsibilities as Receiver of LifeTime Capital, Inc., the previously entered Order needs clarification . . . to include within the scope of the Receivership Assets all entities . . . through which either LifeTime or . . . Svete conducted business and/or effectuated transactions, the intention of which was to remove funds from LifeTime and hinder or delay access thereto.

In addition to moving to "clarify" the scope of the receivership, Moran and Davis filed a joint motion to amend Davis's complaint. The parties sought to add David Svete as a defendant.

The motion to amend the complaint stated, *inter alia*:

The receiver . . . desires that Svete be made a defendant in this cause so that the authority of the receiver as granted or modified by this Court may properly be extended to the assets in the possession or under the control of Svete . . .

On May 5, 2004, after Davis filed an amended complaint naming Svete as an individual defendant, but before Svete received process, the court modified the receivership order.

The court greatly expanded Moran's authority. The amended order indiscriminately granted Moran power over the assets of all entities Svete created, regardless of whether they conducted business with Lifetime. The court did not require Moran to notify the entities, and Moran made no effort to join the entities.

The order provided, *inter alia*:

Sufficient information and evidence exist to support the Receiver's belief that funds of LifeTime were removed from LifeTime's accounts, including the premium reserve account, through a series of transactions involving affiliates of LifeTime.

The scope of the receivership . . . is hereby modified to definitively include all entities by and through which either LifeTime or its principal, David W. Svete, conducted business with and through LifeTime.

The scope of the receivership . . . is also hereby modified to specifically include any and all assets . . . held by any entities created by LifeTime and/or Svete, including, but not limited to, the following:
    Wealth Strategies, Inc.;
    A.C. Group, Inc.;
    A.C. Financial, Inc.;

Sovereign Enterprises, Inc., n/k/a Waterford International, L.L.C.;
Medical underwriting, Inc., a/k/a Medical Underwriting, L.L.C.;
Natlis Capital, Inc.;
Madison Air, Inc.;
Bluecrest Group;
Volcano Enterprises, L.L.C.;
Omni Limited;
Banque De Financier, LTD.;
Marble Capital Parners, Inc.;
Umbrella Capital, L.L.C.

### iii. Second Amended Order

On September 22, 2004, Moran filed a second motion to "clarify" the receivership order. He

requested the order be amended to grant him power over assets of listed entities irrespective of their

current form, i.e., as LLCs, LPs, corporations, etc.

The request provided, *inter alia*:

As of the date of the filing of this Motion, the Receiver has reason to believe that Svete may have been responsible for the formation of as many as 100 business entities. An exhaustive list of these companies is not capable of being produced at this time. Accordingly, the Receiver, . . . requests that the Order of Appointment . . . be further modified to provide that the scope of the Receivership Assets extends to the assets of all entities owned or controlled by Svete, regardless of the business form of the entity.

The court granted the second motion to amend the receivership order on December 2, 2004.

### B. Receiver's Attempts to Garner
### Information and Assets for the Receivership

On January 27, 2005, pursuant to his expansive authority under the amended receivership

order, Moran took possession of the $100,000 that Natlis had deposited with the State of Florida on

January 10, 2000.[7]

---

[7] Florida Statute § 626.9913(3) requires viatical settlement providers to post a $100,000 bond to ensure performance of obligations and protect investors against losses.

The State of Florida attempted to give Natlis notice of the disbursement by sending the notice to Natlis's business address on file with the State. The notice was returned. The State did not send the notice to the address Natlis had provided for service of process.[8]

In June and August of 2005, the receiver deposed William and his wife Joyce.[9] The subpoena served on William required, *inter alia*, that he produce three types of documents:

> 1) Documentation relating to the Svete Family Limited Partnership, the David Svete Revocable Living Trust, or any other entity in which David Svete had at any time held a legal or beneficial interest.
> 2) Documentation showing any transfer of money from David Svete, the Svete Family Limited Partnership, the David Svete Revocable Living Trust or any other entity related to David Svete to any other entity.
> 3) Documentation of payment of money to David Svete, the Svete Family Limited Partnership, the David Svete Revocable living Trust, or any other entity in which David Svete had at any time held a legal or beneficial interest from any other entity.[10]

Although Moran had previously seized Natlis's funds, he did not request that William bring documentation of transactions between Lifetime and Natlis to his deposition. Moran's attorney did not ask any questions during William's deposition about payments from Lifetime to Natlis.

The deposition, which lasted several hours, was broad and unfocused.[11] It appears that Moran

---

[8] Florida Statute § 626.9919 requires viatical settlement providers to give advance notice of any change in address.

[9] Only the transcript of the June deposition of William Svete was included in the record on appeal.

[10] William produced six documents related to DWS enterprises, Gold Finch Investments, Inc., the Svete Family Limited Partnership, and FSI Corp. His lawyer stated that William possessed other relevant documents, but he asserted his privilege against self-incrimination with respect to the documents not produced.

[11] The attorney for the receiver inquired into the work history and personal finances of William, his wife, and their daughters. He inquired generally whether William or any of the family had any ownership interests in any other entities or acted as trustee of any other trusts. He asked whether the relationships between the family and David were still in good standing.

The deposition came to an abrupt halt when Moran's attorney began inquiring about William's personal banking history. At this point, William's lawyer asserted a privacy privilege, and the lawyers adjourned the deposition until the issue could be resolved.

sought general information about anyone or any entity that could possibly have conducted business

with Lifetime. The transcript shows that William mentioned Natlis only twice in eighty-one pages.[12]

Nothing in the deposition indicates that William was aware of the receivership or the duty of Moran

and his attorney to locate Lifetime's assets.

Forty pages into the deposition the transcript states, *inter alia*:

Q: Let me step back for a second, and ask a question I probably should have asked
when we got started, but I started going through the documents. Do you know who
I am? Do you know who I represent?
A: I'm not real sure.
Q: You probably surmised I was a lawyer, at one point during the process.
A: Yes, sir.
Q: Do you know who I represent?
A: I'm not sure I do.
Q: I represent the receiver for Lifetime Capital. I'm assuming you know what
Lifetime Capital is, and we'll talk about Lifetime Capital. But do you know what the
receivership does?
A: Yes.
Q: What's your understanding of what the receiver is charged with doing?
A: I don't understand it fully. He represents Lifetime Capital. At this moment in time,
I do know that.
Q: Do you understand or do you know, essentially, the financial state of Lifetime
Capital?
A: No, I really don't.
Q: Are you aware that investors feel as if they were defrauded at Lifetime Capital?
A: I'm not aware of that.

On February 22, 2005, Moran filed suit against Svete and the entities listed as recipients of

funds in the federal indictment. The defendant entities were: A.C. Group, Inc., Ocean View Holdings

Limited Partnership, Pacific View Management, Svete Family Trust, Svete Family Limited

Partnership, Financial Solutions, Inc., and Leaflet Capital Partners.

On February 2, 2006, United States District Judge Thomas M. Rose dismissed all defendants

---

**12** William stated he knew an individual who worked at Natlis and that Waterford Corporate
Services managed the company. William worked as the Vice President of Waterford handling human
resources, accounting, and administrative tasks from 1999 until he resigned.

except Svete because Moran failed to serve the entities with process.[13]

After his failed attempt to sue the above companies, Moran successfully pursued settlements with a few banks and other businesses.

## C. Financing the Receivership

Shortly before the receivership, Lifetime faced a severe funding problem. Premium payments due on the life insurance policies were about $450,000 per month, and Lifetime had less than that amount remaining in its premium-reserve account.

However, shortly after Moran's appointment and nearly one year before the receiver seized Natlis's funds, two substantial inflows of money averted the funding crisis: 1) on February 20, 2004, Moran obtained a $5,000,000 loan from Oxxford Credit Facility (Oxxford), and 2) on June 16, 2004, the court authorized Moran to use a $6,048,786 benefit payout to make premium payments.

On July 22, 2005, the receiver again needed funding when Oxxford refused to enter into another lending agreement. Shortly thereafter, the court authorized Moran temporarily to bill investors for premium payments, thereby quickly resolving the funding issue.

In March 2006, Moran determined that selling Lifetime's portfolio served the best interest of the company and investors. The receivership obtained $21,015,569.30 in June 2006 from the sale of the policies in Lifetime's portfolio.

On September 22, 2008, the court approved three settlements that the receiver negotiated previously. The settlements brought an additional $1,825,000 into the receivership.

In total, Moran accumulated approximately $25,000,000 for the benefit of investors.

---

[13]Moran's complaint traced the federal indictment. The complaint mentioned Natlis once in a background section that also listed twenty other entities. The remainder of the forty-page document discussed transactions between Lifetime and the defendant entities.

**D. The Investor Claims Process**

During 2004, the court gave Moran permission to pool all investors' viatical interests and to use a *pro rata* distribution scheme. The court also approved a claims procedure. Moran began seeking court approval of investor claims in December 2005.

By the end of 2006, Moran had requested court approval for over 2,024 claims, and the court had approved a distribution of $10,000,000 to investors. At this point, Moran had also spent approximately $6,500,000 paying various settlement and loan expenses. Between 2007 and 2010 the court approved approximately 300 more claims.

When Natlis moved to intervene in February 2008, $7,000,000 remained in the receivership estate. Shortly after Natlis's motion, the court approved a second distribution of $2,000,000 to investors, and approximately one year later, the court approved the distribution of an additional $3,750,000 to investors.

In 2010, approximately two years after Natlis had moved to intervene, Moran moved to disallow the claims of any investor who had yet to file. At this time, approximately $500,000 remained in the receivership estate.

On November 8, 2011, approximately four years after Natlis's motion, the district court denied, as untimely, Natlis's request to intervene.

**Discussion**

**1. Constitutional Standing**

As a federal court of limited jurisdiction, we must examine our authority to hear a case before we can decide the merits. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93-94 (1998). The constitutional minimum for jurisdiction is a dispute presenting a justiciable "case or

14

controversy." U.S. Const. art. III, § 2; *Allen v. Wright,* 468 U.S. 737, 750 (1984). Several doctrines have developed to elaborate the "case or controversy" requirement. *Id.* These doctrines include, among others, standing, mootness, ripeness, and political question. *Id.* Among these doctrines, "[t]he Article III doctrine that requires a litigant to have standing is perhaps the most important." *Id.* "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute." *Id.* To satisfy the standing requirement, "a plaintiff must allege a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* at 751.

It is desirable that a court compare the allegations made in a particular complaint to those made in prior standing cases and dispose of standing at the outset. *Allen,* 468 U.S. at 751-52. However, because the question of standing is jurisdictional, it may be raised at any time. *Louisville & Nashville R.R. v. Motley,* 211 U.S. 149, 152 (1908); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 278 (1977). The parties may address the issue for the first time on appeal. Alternatively, the court may address the issue of standing *sua sponte* at any point, if a doubt arises as to the existence of federal jurisdiction. *Steel Co.*, 523 U.S. at 95.

Appellees allege for the first time on appeal that Natlis lacked constitutional standing to intervene in the receivership. Appellees argue Natlis's injury is speculative because it cannot prove the funds were wrongfully taken from Lifetime's premium reserve account. Appellees further contend that, even if Natlis has suffered an injury, it cannot redress the harm because it does not have capacity to sue as an entity.

Appellees acknowledge this court's holding in *Providence Baptist Church v. Hillandale Comm. Ltd.*, 425 F.3d 309, 315 (6th Cir. 2005), which states that an intervenor is not required to

15

have standing to intervene in an existing suit where the plaintiff has standing. Nonetheless, appellees argue the equitable nature of receivership proceedings distinguishes this case from *Providence*. Appellees contend that requiring Natlis to have standing to intervene in the receivership is consistent with this Court's broad equitable powers over receiverships and the law in other Circuits.

Natlis does not contest the argument that it should be required to have standing to intervene. Instead, it argues its complaint meets the standing requirements.

In *Providence*, this court held "an intervenor need not have the same standing necessary to initiate a lawsuit in order to intervene in an existing district court suit where the plaintiff has standing." *Providence,* 425 F.3d at 315.

"Courts remain divided, however, on the question of whether an intervenor must establish Article III standing." Charles A. Wright et al., FEDERAL PRACTICE & PROCEDURE: JURISDICTION AND RELATED MATTERS, § 3531 (3d ed.). *Compare Perry v. Schwarzenegger,* 630 F.3d 898, 905-06 (9th Cir. 2011) (stating that would-be intervenors need not establish constitutional standing to intervene), *City of Herriman v. Bell,* 590 F.3d 1176, 1183-1184 (10th Cir. 2010) (same), *with Bond v. Utreras,* 585 F.3d 1061, 1072 (7th Cir. 2009) (would-be intervenors must show standing to intervene after dismissal). *See also United States v. Met. St. Louis Sewer Dist.,* 569 F.3d 829, 833 n. 2 (8th Cir. 2009) (parties seeking to intervene must establish Article III standing in addition to the requirements of Fed. R. Civ. P. 24 (a)); *United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1145-46 (D.C. Cir. 2009) (same); *and Juan Cnty., Utah v. United States,* 503 F.3d 1163, 1171-72 (10th Cir. 2007) (standing is not required if an existing party on the same side has

16

standing).[14]

We disagree with appellees. Natlis is not required to demonstrate Article III standing to intervene in the receivership proceeding.

We recognize this Court has not reached the specific issue of intervenor standing in a receivership proceeding in many years. *See Haines v. Buckeye Wheel Co.,* 224 F. 289, 297 (6th Cir. 1915). Additionally, there is no clear guidance from our colleagues in other Circuits. However, after reviewing the history of intervention, we are confident our decision not to require intervenors to demonstrate constitutional standing rests on sound historical footing.

Moore and Levi explored at length the history of intervention. W.M. Moore and Edward H. Levi, *Federal Intervention I. The Right to Intervene and Reorganization,* 45 Yale L.J. 565 (1936). Although civil, ecclesiastical, and admiralty courts allowed strangers with a variety of personal and property interests to intervene in other parties' proceedings, history makes clear that the core of the federal rules of intervention is the protection of third-party property interests. *Id.* at 568-70, 573. "The development began where the harm was most likely to occur": in the *in rem* proceedings of admiralty courts and in receivership proceedings where courts held property in *custodia legis* for undetermined periods of time. *Id.*

By the 1830s, courts of both law and equity permitted intervention. *Id.* at 570. Courts of equity established a unique practice to protect the right to intervene in receiverships in particular. Equity courts correctly noted that, absent the right to intervene in receivership proceedings, third-

---

[14] The Supreme Court has not yet addressed the issue of intervenor standing. *Horne v. Flores*, 557 U.S. 433, 446 (2009). In that case, the lower court found legislators had standing to intervene because the state attorney general failed to protect their interest. The Supreme Court declined to reach the issue of the standing of legislator-intervenors to appeal on the merits because the state superintendent of schools, a defendant in the original action, also appealed, and as a party enjoined by the decision of the lower court, clearly had standing to do so.

parties' property rights could not be adequately protected because receiverships were lengthy and receivership orders prevented third parties from directly suing receivers. *Id.*

Accordingly, equity courts developed the examination *pro interesse suo*. *Id.* During an examination *pro interesse suo*, the plaintiff in the underlying action examined the nature of a third party's property interest in an interrogatory before the court. *Id.* at 571.

In some cases, if the would-be intervenor's property interest was not seriously disputed, the court would not require the examination. *Id.* Instead, the third party was simply allowed to intervene as a matter of course. *Id.*

In this case, it is undisputed that Natlis has a property interest in the funds Moran obtained from the State of Florida. It is also undisputed that the receivership order gave Moran the sole authority to control the receivership assets for an indefinite period of time and prevented Natlis from directly suing the intervenor for conversion.

As such, Natlis's case presents the paradigm case for intervention under Rule 24(a). Contrary to appellees' contention, the receivership context weakens rather than strengthens the argument for requiring a showing of constitutional standing. Requiring Natlis to show standing in addition to satisfying the elements under Rule 24(a) would make it more difficult for the entity to intervene to protect its property interest. This added burden is contrary to the history and purpose of the Rule.

Although other Circuits have required would-be intervenors to show standing, these decisions fail to persuade us that we should follow suit. History demonstrates that the federal rules of intervention were intended to decrease, not increase, the difficulty facing third parties seeking to protect property interests. Accordingly, we are not persuaded to adopt a new rule requiring intervenors to show constitutional standing in addition to satisfying the requirements of Rule 24(a).

18

Since we decline to require Natlis to show constitutional standing, we need only determine whether the lower court properly determined Natlis's interest was insufficient to support intervention under Rule 24(a).

## 2. Motion to Intervene

This court has consistently held that, except as to the timeliness element, judicial review of a decision regarding intervention as of right is de novo. *Grutter v. Bollinger*, 188 F.3d 394, 401 (6th Cir. 1999). In most cases, judicial review of the lower court's timeliness decision is for abuse of discretion. *Veliscol Chem. Corp. v. Enenco, Inc.,* 9 F.3d 524, 531 (6th Cir. 1993). A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Brown v. Raymond Corp.,* 432 F.3d 640, 647 (6th Cir. 2005).

Federal Rule of Civil Procedure 24(a) governs intervention as of right. Rule 24(a) provides:

> [o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

*Id.*

A court considers four elements in evaluating whether a third party has a right to intervene, and "failure to meet [any] one of the [four] criteria will require that the motion to intervene be denied." *Grubbs v. Norris,* 870 F.2d 343, 345 (6th Cir. 1989). The court must assess:

> 1) timeliness of the application to intervene, 2) the applicant's substantial legal interest in the case, 3) impairment of the applicant's ability to protect that interest in the absence of intervention, and 4) inadequate representation of that interest by parties already before the court.

*Michigan State AFL-CIO v. Miller,* 103 F.3d 1240, 1245 (6th Cir. 1997).

In considering whether a proposed intervenor satisfies the four-part test, the factual

19

circumstances considered under Rule 24(a) should be "broadly construed in favor of potential intervenors." *Purnell v. City of Akron,* 925 F.2d 941, 950 (6th Cir. 1991). "[C]lose cases should be resolved in favor of recognizing an interest under Rule 24 (a)." *Grutter*, 188 F.3d at 399.

### a. Timeliness

The lower court denied Natlis's motion to intervene based solely on its determination that Natlis's motion was untimely. Ironically, the court waited three years and eight months to make that determination.

This Circuit has consistently looked to the totality of the circumstances to determine timeliness. *See Stupak-Thrall v. Glickman,* 226 F.3d 467, 475 (6th Cir. 2000) ("the absolute measure of time between the filing of the complaint and the motion to intervene is one of the least important circumstances," citing with approval *Sierra Club v. Espy,* 18 F.3d 1202, 1205 (5th Cir. 1994) (when measuring timeliness of a motion to intervene, "absolute measures of timeliness should be ignored")). *See also United States v. Pitney Bowes, Inc.,* 25 F.3d 66, 70 (2d Cir. 1994) (timeliness defies precise definition and certainly is not confined strictly to chronology).

To determine timeliness this Circuit reviews five factors:

(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Jansen v. City of Cincinnati,* 904 F.2d 336, 340 (6th Cir. 1990).

### i. Point to Which the Suit Has Progressed

The lower court agreed with appellees that Moran's activities on behalf of the receivership prior to Natlis's motion showed that the suit had progressed substantially.

Prior to Natlis's motion to intervene, Moran had pooled assets, secured $25,000,000 for the receivership estate, established a streamlined process for approving claims, requested approval for a substantial number of claims, and distributed all but $7,000,000 of the receivership funds.

Natlis contends that referencing Moran's actions prior to its motion is insufficient because Moran took numerous actions after Natlis's motion as well. After Natlis moved to intervene Moran sought court approval of settlements bringing an additional $1,875,000 into the receivership estate, continued to seek approval of claims, and distributed approximately $6,500,000 to investors.

This Circuit looks to the case-management plan of the lower court to determine the progress of a suit. We have approved orders denying intervention on the basis of substantial progress only in limited circumstances when a district judge established a firm case management schedule and "stuck to it." *See Stupak-Thrall,* 266 F.3d at 473-74 (district court set an expedited case management plan, adhered to strict deadlines, and disposed of case within ten and a half months after it was filed); *Clarke v. Baptist Mem'l Healthcare Corp.,* 427 F. App'x 431, 436 (5th Cir. 2011) (court set definite litigation milestones that had passed: the close of class-certification, discovery, and a decision on the merits of class certification).

Limiting a finding of substantial progress to cases with clearly defined and enforced litigation schedules aligns with the practice of other courts allowing intervention after substantial time unless "a lot of water has passed under . . . the litigation bridge." *United States v. Alisal Water Corp.,* 370 F.3d 915, 922 (9th Cir. 2004). *See Mountain Top Condo. Assoc. V. Dave Stabert Master*

*Builder, Inc.,* 72 F.3d 361, 370 (3d Cir. 1995) (allowing intervention as of right where four years had passed between the filing of the complaint and the motion to intervene, but there were no depositions taken, dispositive motions filed, or decrees entered); *United States v. State of N.Y.,* 820 F.2d 554, 557 (2d Cir. 1987) (allowing intervention three years after money was seized and four years after the start of the lawsuit).

Generally, courts play a limited role in managing the day-to-day progress of receiverships. Courts delegate substantial authority to receivers to manage receivership affairs. Receiverships proceed in a non-linear fashion and are indefinite in duration. As such, they do not fit within the limited circumstances under which this court denies intervention on the basis of substantial progress.

After briefly listing the actions of the receiver prior to the motion to intervene, the lower court concluded that "[t]he progress in the case has been extensive and cannot be fairly characterized as anything less." The lower court's finding that the receivership had substantially progressed was, however, clearly erroneous. As of the date of filing of the motion to intervene, much, to be sure, had been done. But the receiver had much more to do in the years that followed. Had the lower court resolved the motion to intervene more promptly, the disruptive effect on nearly concluded proceedings would have been substantially less than it may now be. But such delay is not a basis on which to bar intervention due to the state of progress of the proceedings.

### ii. Purpose of Intervention

District courts should evaluate the purpose of intervention in terms of the "importance of the legal interests asserted." *Clarke*, 477 F. App'x at 436 (citing *Blount-Hill v. Zelman,* 636 F.3d 278, 285 (6th Cir. 2011)). Concluding that an interest is not sufficiently important because a third party fails to make intervention a "first priority" is inappropriate. *Id.* If a third party seeks merely an

opportunity to present an argument or expertise, participation as an *amicus curiae* may adequately protect its interests. *Stupak-Thrall,* 226 F.3d at 475.

The lower court stated that "Natlis has an interest in attempting to protect assets that were seized in 2005, [however], after considering Natlis' significant delay in requesting to intervene, the weight of this factor in favor of intervention is negligible."

Instead of assessing the importance of the legal property interest Natlis asserted, the lower court referenced Natlis's perceived failure to intervene in a timely manner. The court used Natlis's putative delay to undermine the importance of the interest it asserted. As such, the lower court erroneously decided that Natlis's purpose was insufficient to support intervention.

Its error in doing so becomes manifest on consideration of the that which it applied to this factor – namely, Natlis's apparent delay. As discussed in the next subsection, that premise – that Natlis failed to act with sufficient dispatch in seeking to intervene – is also clearly erroneous.

### iii. Length of Time Preceding Intervention During Which the Proposed Intervenor Knew or Should Have Known of Its Interest in the Case

"A party must have been aware of the risk that his interest may be affected by the litigation, and that its interest may not be fully protected by the existing litigants." *Stotts v. Memphis Fire Dep't,* 679 F.2d 579, 583 (6th Cir. 1982) (citations omitted) (stating newspaper articles and restraining order restricting promotions at proposed intervenor's place of employment provided notice). Actual notice is not required. *Id.* Constructive notice of an interest in a case may be implied from a variety of circumstances. *See Nat'l Ass'n for Advancement of Colored People v. New York,* 413 U.S. 345, 366 (1973) (notice implied from newspaper article; public comment by community leaders; size and astuteness of membership and staff of organizational appellant; and questioning

23

of two individual appellants belonging to appellant organization regarding the subject matter of the litigation); *Michigan Ass'n for Retarded Citizens v. Smith,* 657 F.2d 102 (6th Cir. 1981) (notice implied from extensive media coverage and presence of court ordered monitors at proposed intervenors place of work); *Fed. Deposit Ins. Corp. v. Hanrahan,* 612 F.2d 1051, 1053 (7th Cir. 1980) (notice from writ of attachment issued against husband's interest in jointly owned residence, which prevented wife from completing sale of residence).

The lower court stated that Natlis should have known of its interest in the receivership proceeding after Moran's attorney deposed William or, alternatively, before the deposition on January 27, 2005, when the Florida Department of Financial Services attempted to notify Natlis that it released the company's funds.

Natlis contends, and we conclude, that neither the deposition nor Florida's failed attempt to send notice sufficed as constructive notice of its interest in the suit. Accordingly, Natlis contends it did not have notice of its interest until April 2007, when Svete told his father, William, that he discovered the seizure of the funds while reviewing company paperwork.

The determination of whether Natlis had constructive notice of its interest in the case prior to April 2007 is not straightforward. The facts in this case are not analogous to any of our previous cases. When competing inferences may be drawn from the same facts, this court is required to construe the facts in favor of the would-be intervenor. *Purnell,* 925 F.2d at 950. So construed, the record does not support a finding that Natlis had notice of its interest prior to April, 2007.

The deposition in this case is clearly distinguishable from the questioning that took place in *Nat'l Ass'n for Advancement of Colored People, supra.* In that case, Justice Department attorneys contacted members of an organization that had been closely following a voting-rights case to discuss

24

voter registration in affected counties. It was reasonable for the court to attribute knowledge of an interest in litigation to the third-party organization because it admitted to closely following the case. 413 U.S. at 366.

In contrast, the deposition in this case would not have put a reasonable person on notice of Natlis's interest in the receivership proceeding. There is no evidence in the record that William followed the Lifetime receivership proceeding. Moran's attorney did not request William to appear on behalf of Natlis nor did he request that William bring documentation of Natlis's business activities. Most importantly, William told the attorney during the deposition that he did not know the attorney's role, nor did he understand the nature of the receivership proceeding.[15]

The lower court also attributes notice to Natlis in January 2005. In the lower court's view, Natlis would have received notice of the seizure of its funds if it had provided Florida with another forwarding address. At most, Natlis's failure to do so was due to oversight. More importantly, it could reasonably rely on the fact that it had provided an address for service of process. Moreover, it could reasonably rely on receiving notice affecting its assets *via* that address.

In any event, Natlis's failure to provide an up-to-date address did not constitute willful indifference to its interests. The fault for its failure to receive actual notice lay far more with the State of Florida, which did nothing after its notice was returned. It is clearly erroneous to find constructive notice on the basis of the facts in this case.

Instead of construing the facts in Natlis's favor, the lower court relied on an insufficient evidentiary basis to find constructive notice – and thus excessive delay on Natlis's part in seeking

---

[15] In addition, the one opaque reference during the deposition to what a receiver does and the two passing references to Natlis would not put a reasonable person on notice that the receivership affected Natlis's assets. Nothing in the eighty-page deposition transcript linked Lifetime and Natlis in a manner that would have put a reasonable person (including William) on notice that he needed to investigate Natlis's interest in the proceeding.

25

intervention. The lower court committed clear error when it failed to construe the disputed facts in Natlis's favor. Applying the correct standard requires finding Natlis did not have notice until April 2007.

## iv. Prejudice to the Original Parties Due to the Proposed Intervenor's Failure to Promptly Intervene After It Knew or Reasonably Should Have Known of Its Interest in the Case

Natlis waited ten months after learning of its interest to intervene. This delay alone, absent a finding of incremental prejudice, is insufficient to deny the motion as untimely.

"The most important consideration in deciding whether a motion for intervention is untimely is whether the delay in moving for intervention will prejudice the existing parties in the case." Wright et al., *supra,* § 1916. The only prejudice relevant to the timeliness determination is incremental prejudice from a would-be intervenor's delay in intervening, not prejudice from the intervention in and of itself. *See Stotts*, 679 F.2d at 584; *see also Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977) (relevant issue is not how much prejudice would result from allowing intervention, but rather how much prejudice would result from the would-be intervenor's failure to request intervention as soon as he knew or should have known of his interest in the case). A court cannot squeeze a proposed intervenor from both ends by first ruling a motion to intervene premature and then ruling a second motion to intervene too late. *Grubbs v. Norris,* 870 F.2d 343, 346 (6th Cir. 1989).

The lower court agreed with appellees that, although "[t]he incremental prejudice may not be great . . . [it] will still likely be significant." The court stated:

> At the very least, Natlis's intervention would likely delay claims and distribution of proceedings as well as cause additional expenses upon the

26

Receivership. Given this, the original parties would undoubtedly experience some prejudice if Natlis is allowed to intervene, and accordingly, this factor weighs against intervention.

The lower court's analysis erroneously relied on the general inconvenience of allowing Natlis to intervene. The proper metric is the incremental prejudice the parties would have suffered from allowing Natlis to intervene ten months after it learned of its interest in the receivership.

There is no such incremental prejudice in this case. At the time Natlis moved to intervene, $7,000,000 remained in the receivership estate. The fact that Moran had previously established claims procedures and had begun paying claims weighs in favor of granting intervention. Moran would have experienced greater inconvenience if Natlis had sought to intervene during the initial stages of the receivership. At that time, Moran was busy securing loans, setting up a procedure to notify investors, and finding experts to manage the fund.

Moran would have experienced the same delay in making distributions even if Natlis had sought to intervene ten months earlier immediately after it first learned of its interest. As such, this inconvenience cannot be properly deemed incremental prejudice. The lower court erroneously relied on the delays and associated expenses in making its prejudice determination.

### v. Unusual Circumstances Militating For or Against Intervention

This court does not have an established list of additional factors that it considers in every timeliness analysis. Natlis argues that the lower court's failure to provide it with any notice or process prior to seizing its funds is an additional factor militating in favor of intervention. Appellees contend that Natlis's "culpability" is an unusual circumstance militating against intervention. The lower court concluded "[u]pon careful consideration of the above mentioned arguments and the overall progress of this complex case, including the extensive claims procedures that have been

27

established and the settlement agreement entered into with certain investors . . . existing circumstances further militate against intervention."

It is not error for a court to consider the total balance of the timeliness factors under this prong. However, in this case, our disagreement with the lower court's individual analysis under the previous prongs renders the lower court's conclusion under this prong problematic. We have already disagreed that the previous factors weighed against intervention. As such, the totality of these factors does not militate against intervention.

We need not reach the issue of whether a would-be intervenor's criminal involvement in a fraud militates against allowing it to intervene in a civil action because there is no evidence in the record that Natlis actually received monies from Lifetime or that William was involved as a co-conspirator in defrauding Lifetime's investors. As such, appellees' claim that Natlis's "culpability" weighs against intervention is meritless.

We agree with Natlis that the lack of notice and process prior to the court's seizure of its assets is an unusual factor militating in favor of intervention.

Finally, we conclude the lower court's nearly four-year delay in ruling on the motion to intervene is a factor militating in favor of intervention. During this time the assets in the receivership decreased from $7,000,000 to $500,000. The lower court's dilatoriness may have severely prejudiced Natlis's ability to recover its funds.

In sum, the lower court's timeliness analysis was an abuse of discretion.

### b. The Remaining Factors
### Under Rule 24 (a)(2)

As a general rule, an appellate court may not consider an issue not addressed below. *Singleton,* 428 U.S. at 120. However, this rule is subject to certain limited exceptions. "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Id.* This court will decide an issue a lower court does not reach if the issue is a purely legal one or if doing so is in the interest of judicial economy. *Lindsay v. Yates,* 498 F.3d 434, 441 (6th Cir. 2007). Specifically, this court may decide all of the elements under Rule 24(a) even if the lower court did not reach them. *See Blount-Hill,* 636 F.3d at 284.

Although the lower court considered only the timeliness element under Rule 24(a), we elect to decide the remaining elements for intervention as of right. There is no genuine dispute surrounding the remaining factors. On remand the lower court will be able to proceed directly to the issue of capacity and to the merits of the conversion claim.

### i. The Applicant's Substantial Legal Interest in the Case

Proposed intervenors must show they have a substantial interest in the subject matter of litigation. *See Jansen,* 904 F.2d at 341. However, this Circuit subscribes to a "rather expansive notion of the interest sufficient to invoke intervention of right." *Michigan State AFL-CIO v. Miller,* 103 F.3d 1240, 1245 (6th Cir. 1997). This Circuit rejects the requirement of a "specific legal or equitable interest." *Id.* (quoting *Purnell,* 925 F.2d at 948). "The inquiry into the substantiality of the claimed interest is necessarily fact-specific." *Id.*

It is undisputed that Natlis is asserting a property interest. A definite property interest is more than this Circuit requires under the substantial interest prong. Accordingly, Natlis satisfies this

29

requirement.

## ii. Impairment of the Applicant's Ability
## to Protect that Interest in the Absence of Intervention

"To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal." *Grutter,* 188 F.3d at 399 (citations omitted).

The facts regarding impairment of Natlis's ability to protect its funds are beyond dispute. The receivership order gave Moran the power to seize Natlis's assets and prohibited Natlis from suing or otherwise obstructing Moran's efforts to do so. During the course of the receivership Moran distributed nearly $25,000,000 in funds, and he likely intends to use the remaining $500,000 to pay investors and receivership expenses. Absent a finding that Moran can proceed against prior distributees, Natlis will be unable to recover its funds. The possibility that a third party may be precluded from ever recovering its property is without question an impairment of the party's ability to protect its interests.

## iii. Inadequate Representation of that Interest
## by Parties Already Before the Court

The proposed intervenor's burden in showing inadequacy is "minimal." *See Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10 (1972); *Linton ex rel. Arnold v. Comm'r of Health & Env't.,* 973 F.2d 1311, 1319 (6th Cir. 1992). "The proposed intervenor need show only that there is a *potential* for inadequate representation." *Grutter,* 188 F.3d at 400 (emphasis in original). "[I]t may be enough to show that the existing party who purports to seek the same outcome will not make all of the prospective intervenor's arguments." *Id.* "If the interest of the absent party is not represented at all, or if all existing parties are adverse to the absent party, then she or he is not

30

adequately represented." *Grubbs,* 870 F.2d at 347. "An interest that is not represented at all is surely not adequately represented, and intervention in that case must be allowed." *Id.*

It is evident that both Davis's and Lifetime's interests are adverse to Natlis's interests. Davis, as an investor, is interested in being paid from the receivership assets, and Moran, acting on Lifetime's behalf, aims to distribute the receivership assets to investors as efficiently as possible. As such, the current parties cannot be said to represent Natlis's interest adequately in preserving its funds.

## Conclusion

In conclusion, we hold that Natlis is not required to show constitutional standing to intervene. We further hold that the lower court abused its discretion in denying Natlis's motion to intervene. Natlis satisfies the requirements for intervention as of right. As such, we need not reach the issue of permissive intervention.

Accordingly, we REVERSE the district court's decision denying intervention under Rule 24(a) because Natlis satisfies the requirements for intervention as of right. We REMAND the case to the district court to determine the issue of Natlis's capacity. If the lower court decides Natlis has capacity, then it should proceed to decide the merits of Natlis's conversion claim.